174 N.J. Super. 310 (1980)
416 A.2d 436
PARIS OF WAYNE, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RICHARD A. HAJJAR AGENCY AND LAWRENCE RUBIN, DEFENDANTS-APPELLANTS, AND ANDREW NESTICO, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued April 15, 1980.
Decided June 4, 1980.
*312 Before Judges CRANE, MILMED and KING.
Roger Kulka argued the cause for appellant Lawrence Rubin.
Paul D. Solomon argued the cause for appellant Richard A. Hajjar Agency (Solomon and Ramer, attorneys).
David Carmel argued the cause for respondent (Edwin C. Eastwood, Jr., of counsel and on the brief).
The opinion of the court was delivered by KING, J.A.D.
Plaintiff, a manufacturer of clothing, brought this suit against defendant Richard A. Hajjar Agency, a real estate broker, and defendant, Lawrence Rubin, its affiliated agent. Plaintiff alleged that defendants acted as its broker in the rental of a property at 1095 Ringwood Avenue, Wanaque, Passaic County. The property was located in a commercial zone and had been used previously as a supermarket. Shortly after plaintiff commenced its clothing manufacturing operation on August 1, 1977, it was told to stop production because manufacturing was not a permitted use of the property. After production was closed down, plaintiff claimed damage because orders could not be met.
The parties stipulated at trial that defendant Rubin was an agent of the Hajjar Agency and that he violated his professional duty to plaintiff by negotiating for a rental property at which plaintiff's contemplated activity, clothing manufacturing, as expressed in the lease which Rubin drew, was illegal. The question for the trial judge, sitting without a jury, was the extent of *313 plaintiff's entitlement to damages. The trial judge found defendants liable for the loss of the full income on four contracts which he found Rubin's negligence prevented plaintiff from completing and entered judgment in the amount of $58,900, which sum also included defendants' $300 broker's fee to plaintiff.
On the appeal appellants contend that the loss of income from interruption of manufacturing was not a proper element of damages because it was not within the fair contemplation of the parties at the time the brokerage contract was consummated. Defendants also argue that the verdict was against the weight of the evidence and that plaintiff failed to mitigate damages.
We recite the facts as we infer them to have been found by the trial judge. In early July 1977 plaintiff's principal, Karrell, who had 28 years' experience in the trade, and plaintiff's fashion designer Chaoui called the Hajjar Agency and spoke to defendant Rubin about renting space for plaintiff's clothing manufacturing operation. Rubin took them to an empty supermarket on Ringwood Avenue in Wanaque which they agreed to rent for $300 a month. On July 27 a handwritten lease prepared by Rubin on an Hajjar Agency form was executed. The lease commenced on August 1 for three months, thereafter to continue month-to-month. Plaintiff paid defendants' broker's fee of $300 and the first month's rental upon execution of the lease.
On July 28 plaintiff installed four sewing machines, a cutting table, an electric scissors and six mannequins, and commenced operation. About 12 days thereafter the building inspector came to the premises and directed plaintiff's personnel to cease operations because of a violation of the local land use ordinance. When this happened Rubin assured Karrell and Chaoui that he knew the mayor and that everything would be all right. Karrell testified that Rubin called back three days later and said that work could be resumed. Plaintiff did resume operations but on August 24 the building inspector returned and again ordered it to cease. Work stopped and was never resumed. Shortly thereafter plaintiff vacated the premises.
*314 The damage issue focused on four purchase orders, evidence of which was presented as follows:
(1) The Magnificiant Two Boutique, Inc., of Newark: This order was dated August 1, 1977 with a specified delivery date of August 25, 1977. The order was for suits, 24 small, 24 medium and 24 large at $60 each; for coats, 36 small, 36 medium and 48 large at $75 each; a total of $13,320.
(2) Fashion Express, Newark: This order was dated August 1, 1977 and the specified delivery date is August 20, 1977. The order was for suits, 24 small, 24 medium, and 24 large, at $60 each; for coats, 48 small, 48 medium and 48 large, at $75 each; a total of $15,120.
(3) The Cockeyed Parrott, Roslindale, Massachusetts: The order was for 250 coats at $75 apiece with a delivery date of August 23; a total of $18,750.
(4) Kairallo Trousseau Shop, Magnolia, Massachusetts: The order was for 150 coats at $75 apiece to be delivered by August 31; a total of $11,250.
These deadlines keyed into the Fall line which opens right after Labor Day. Neither Rubin, nor any other representative of the Hajjar Agency, were at any time told of the size of these purchase orders or of the delivery deadlines.
Plaintiff presented evidence that about $8,300 was spent on materials (wool, cashmere, thread, buttons, etc.) to fill these orders. Another $4,000 was spent on machinery, furniture and travel and miscellaneous expenses.
At the time plaintiff was forced to cease operations, all of the material had been cut and the garments were partially sewn, but none had been completed for shipment. Plaintiff's principals allegedly still retain the garments. Karrell testified that when operations ceased on August 24 it was impossible to find other jobbers to complete the garments; he testified that the material is now worthless since the garments were out of style.
At trial plaintiff contended that all of the orders would have been filled if the manufacturing operation had not been halted because of the zoning violation. The delivery dates on the four orders were August 23, 25, 30 and 31. Karrell testified that it was the custom in the trade that a manufacturer was permitted to deliver garments up until 12 working days after the deadline specified in the purchase order. Defendants strenuously opposed this alleged trade custom of an automatic extension of delivery dates with evidence that delivery dates in the trade were firm. The trial judge made no specific finding on this *315 point. From the conclusions he reached, as expressed in his oral opinion, we of necessity infer that he believed plaintiff's contention of an automatic 12-day extension of delivery.
The trial judge found that defendants, as professionals, "had a duty to provide premises in which [the] industry was permitted" and that "they were negligent in not checking the local ordinances before providing these premises to the plaintiffs." The judge found that "unquestionably, it was within the contemplation of the parties that manufacturing would ensue and that the plaintiff would suffer if such manufacturing was interrupted."
The trial judge refused to limit plaintiff's damages to the differences between the rental value of the premises and the rent reserved under the lease, as urged by defendants. The trial judge considered plaintiff's cost of materials and capital equipment as irrelevant on the damage issue. The judge looked exclusively to the four purchase orders "to determine what is the nature of the damage." He made the following specific factual findings relevant to the damage issue:
I'm satisfied that the plaintiff has proved by a preponderance of the evidence that the merchandise was cut up to the point [by August 24] where, unless it was within a very reasonable time sewn and incorporated into garments, that these items would be of no value because of the seasons which determine style and so forth in the industry, so that I start off with the proposition that the defendants cannot get any credit as against any claim that these are salvageable. There's no evidence that they're of any value, whatsoever, so I'm satisfied that by the time that the building inspector said that they had to cease and desist, that the material had not yet been fashioned into garments and since no other work was done, that unless the plaintiff was able to find another premises [in] which he could continue his operation within a very short period of time, these would be useless, and I am satisfied that under all of these circumstances, the plaintiff sat still because he was assured by Mr. Rubin that he would be able to continue his operation within the premises and the time passed within a few weeks after that when it wouldn't matter where he went.
It wouldn't matter whether he made any effort to find any place to go because it was too late. I'm also satisfied that plaintiff made an effort to find a place and was unable to do so. I'm also satisfied that the defendant made no effort to find another place for him at the time.
The trial judge stated that "to a good extent I'm satisfied with the credibility of the plaintiff" that the represented unit price per garment would have been paid to it on delivery, and *316 announced that he would mold a verdict based on the sum of the unit prices. Thereafter, a judgment was entered in the amount of $58,900 which included the $300 broker's fee and purported to represent the sum of the unit price of all ordered garments.
Although far from a model of clarity, we conclude from the oral opinion of the trial judge that the following findings were made by him: (1) the initial 2 1/2-day interruption and production earlier in August and the cessation of production on August 24 was the "proximate cause" of "whatever damage was suffered"; (2) if the production had not been so interrupted, plaintiff would have probably, with the appropriately anticipated 12-working-day extensions under the alleged trade practice, met the delivery dates; (3) Karrell's testimony about (a) other jobbers being unavailable during the rush season to assemble the garments, (b) how he looked but was unable to find another manufacturing premises on short notice, (c) Rubin's continuing representations that all problems would be quickly resolved[1] and (d) the unsalvageable nature of the garment pieces because of the passage of the fall seasonal style as serving to satisfy plaintiff's legal duty to reasonably attempt to mitigate damages, was true. Although not as well reasoned and specific as they could be, see R. 1:7-4, these findings and conclusions are fairly inferable from the oral opinion. The case was a factually close one. Although we might have reached different conclusions as factfinders, we cannot say that the trial judge's findings were without reasonable support in the record under the appropriate standard of review. Rova Farms Resort v. Investors Inc. Co., 65 N.J. 474, 483-484 (1974).
Defendants contend that plaintiff's recovery should be limited to the measure of damages applicable where a lessor breaches a contractual duty to afford a lessee quiet enjoyment of a demised premises. The rule has been stated in Hodgson v. Applegate, 55 N.J. Super. 1 (App.Div. 1959), aff'd 31 N.J. 29 (1959), as follows:

*317 In an action by a lessee against a lessor for failure to deliver possession, the tenant is in general entitled to recover the rent reserved under the lease. Weiss v. Revenue Building & Loan Ass'n., 116 N.J.L. 208, 211 (E. & A. 1935); Adrian v. Rabinowitz, 116 N.J.L. 586, 591 (Sup.Ct. 1936). Where profits to be derived from the conduct or operation of a business on the demised premises are a factor in arriving at the rent to be paid by the tenant or in arriving at the value of the term, and this is in the contemplation of the parties at the time of the making of the lease, recovery may be had for lost profits if the evidence affords a basis for estimating the damages with reasonable certainty.
"If the business is one that has already been established a reasonable prediction can often be made as to its future on the basis of its past history. Evidence as to its past expenditures and receipts and of the conditions under which the business was carried on is frequently held to afford a sufficiently certain basis for a verdict awarding damages for profits prevented." 5 Corbin, Contracts (1951), § 1023, p. 128.
"Doubts are generally resolved against the party committing the breach of contract." Restatement, Contracts, § 331(1), comment (c), p. 517.
See also Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 144 (1950); Stanley Co. v. Hercules Powder Co., 16 N.J. 295, 314-15 (1954); Tessmar v. Grosner, 23 N.J. 193, 203 (1957); Casler v. Weber, 27 N.J. Super. 396 (App.Div. 1953); Apex Metal Stamping Co. v. Alexander & Sawyer, Inc., 48 N.J. Super. 476, 482 (App.Div. 1958); McCormick, Damages (1935), § 29, p. 107 et seq. [at 16-17]

Defendants further contend that loss of income or profits was not a factor in arriving at the rent to be paid and was not within the contemplation of the parties at the time of the making of the lease, especially since the plaintiff did not have a "going business". See Kurtz v. Oremland, 33 N.J. Super. 443 (Ch.Div. 1954), aff'd o.b. 16 N.J. 454 (1954).
We do not view this as a breach of lease case. This is a case where a real estate broker and its agent breached their professional duty to a client. Our then-highest court over 60 years ago described the professional duty owed and the consequences of a breach thereof in Poniatowski v. Griffiths & Cinkowski, 91 N.J.L. 663 (E. & A. 1918), stating:
... The trial judge in charging the jury correctly stated the legal rule applicable to the facts of the case, that the law is that men who undertake to do a service for another, in a business or professional capacity, like real estate agents, and the like, undertake to use the reasonable skill, which is ordinarily possessed by their fellows in like service, nothing more and nothing less; if they fail in the performance of that duty, they are responsible to the injured person, to the extent of the damages, that either naturally flow from the wrongful act and are a direct consequence of it, or of those results, these consequences, which are in contemplation of the parties at the time the service is undertaken. [at 665]
See, also, Sullivan v. Jefferson, Jefferson & Vaida, 167 N.J. Super. 282, 286-287 (App.Div. 1979), stating:

*318 ... [I]n light of his holding himself out as a specialist in his field of endeavor, a broker's failure to exercise reasonable skill, care and diligence in performing his undertaking will subject him to any resulting damages either for breach of contract or in tort for negligence or breach of his fiduciary duty, as the facts may warrant. [at 286-287]
There is no doubt under the facts as found by the trial judge that plaintiff's loss of income from its inability to fill the four purchase orders naturally flowed and resulted from and was a direct consequence of defendant Rubin's negligence in the performance of his professional duty to his client. Plaintiff had committed substantial funds for material, labor, overhead, and machinery, and its principals had ventured substantial time and energy in the production of garments to meet firm contract commitments. Given the facts as found, there was nothing speculative about plaintiff's reasonable expectation of economic benefit  the sum of the unit prices upon delivery as stated in the purchase orders.
Defendants strenuously contend that the consequential damages to plaintiff were not recoverable because they were not within the contemplation of the parties at the time the lease was executed. There is no evidence that plaintiff's principals ever told Rubin about the four substantial purchase orders and their imminent delivery dates. The rule of limitation on consequential damages to those fairly and reasonably contemplated by the parties at the time of the execution of the contract was sometime ago articulated in Hadley v. Baxendale, 9 Ex. 341, 354-355, 156 Eng.Rep. 145, 151 (1854), where Baron Alderson stated:
... Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the *319 great multitude of cases not affected by any special circumstances, from such a breach of contract. For, had the special circumstances been known, the parties might have specially provided for the breach of contract by special terms as to the damages in that case; and of this advantage it would be very unjust to deprive them.
The rule of Hadley v. Baxendale, is today embodied in Restatement, Contracts, § 330 at 509 (1932), as follows:
In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown specifically that the defendant had reason to know the facts and to foresee the injury.
See, also, Tessmar v. Grosner, 23 N.J. 193, 203 (1957).
The principle is not of easy application in certain cases, including this one. Rubin did not know the specifics of any pending purchase order at the time the lease was executed on July 27. Indeed, only one purchase order was actually executed before the lease. Two were executed four days after the lease. One is undated in this record. Therefore Rubin could only foresee that if the anticipated clothing manufacturing operation stopped because of illegality, the stoppage could cause general disruption of plaintiff's business operations. He could not foresee the specific nature and quantity of damage to plaintiff his blunder could cause; he could foresee generalized harm and damage.
Professor Corbin states:
Just as reason to foresee does not mean actual foresight, so also it is not required that the facts actually known to the defendant are enough to enable him to foresee that his breach will cause a specific injury of a particular amount in money ... The rule does not require that anything should have been foreseeable to a deed certainty; seldom can anything be predicted with such assurance as that. [5 Corbin, Contracts, § 1012 at 88 (1951)]
Corbin thereafter recites many examples of recoverable consequential damages in cases generally analogous to the present case, such as the butcher's meat spoiling when the iceman breaches his duty to deliver, or the failure to supply specially ordered machinery thus preventing the continuation of production. Id., § 1013 at 90 to 95. See also, 11 Williston, Contracts (3 ed. 1968), §§ 1347 to 1357 at 251 to 298.
*320 The disproportionality between the commission received by Rubin and his agency, $300, and the exposure to a judgment of $58,900 may give pause about the wisdom of imposing liability of the breaching promisor in this case. The real reason behind the rule of Hadley v. Baxendale has been articulated by Professor Patterson as follows:
The rule of Hadley v. Baxendale is an attempt to restrict the promisor's liability for breach of promise to those consequences, the risk of which he knew about, or must be taken to have known about, when he made the contract. The scope of damage for breach of contract is much narrower than the "proximate consequence" rule which prevails in actions to recover for a tort. If we may assume that the defaulting promisor is usually an entrepreneur, a business man who has undertaken a risky enterprise, the law here manifests a policy to encourage the entrepreneur by reducing the extent of his risk below the amount of damage which, it might be plausibly argued, the promisee has actually been caused to suffer. [Patterson, "The Apportionment of Business Risks Through Legal Devices," 24 Colum.L.Rev. 335, 342 (1924)]
The rule tends to insulate a defaulting promisor from occasional extreme hazards where his engagement in a risky enterprise may be for the overall benefit to society. The rule has evolved in the commercial context into N.J.S.A. 12A:2-715(2)(a) of the Uniform Commercial Code which states rather broadly that "[c]onsequential damages resulting from the seller's breach include ... any loss resulting from general or particular requirements and needs of which the seller at the time of the contracting had reason to know and which could not reasonably have been prevented by cover or otherwise...." A noted authority concludes the analysis of the commercial development of the rule in Hadley v. Baxendale as follows:
... Because of the brevity and significance of 2-715, it is important to remember that it draws on over a century of common law development, which began with Hadley v. Baxendale. The better-reasoned authority emerging from that background and the intent of the draftsmen declare that the basic test for the recovery of consequential damages is whether the losses were foreseeable (not foreseen) by the seller at the time he entered the contract. The trend of Code cases to date strongly suggests that the courts will construe this foreseeability requirement to the plaintiff's benefit. [White & Summers, Uniform Commercial Code, § 10-4 at 325 (1972)].
If this case were strictly in a commercial context, perhaps the disproportionality between defendants' compensation and their exposure might tilt the scales against an award of consequential damages. But defendants are not just businessmen. They are *321 members of a trained and carefully regulated profession affected with a public interest. The real estate broker is "looked upon as a fiduciary and is required to exercise fidelity, good faith and primary devotion to the interests of his principal." Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 553 (1967). Our Supreme Court therein strongly stated the extent to which the real estate brokerage profession is pervaded with the public interest as follows:
Courts and legislatures have grown increasingly sensitive to imposition, conscious or otherwise, on members of the public by persons with whom they deal, who through experience, specialization, licensure, economic strength or position, or membership in associations created for their mutual benefit and education, have acquired such expertise or monopolistic or practical control in the business transaction involved as to give them an undue advantage. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, pp. 388-391 [75 A.L.R.2d 1] (1960). Grossly unfair contractual obligations resulting from the use of such expertise or control by the one possessing it, which result in assumption by the other contracting party of a burden which is at odds with the common understanding of the ordinary and untrained member of the public, are considered unconscionable and therefore unenforceable. [Id. at 553-554]
We cannot square this declaration of a real estate broker's duty to the public with a rule of damages limiting defendants' liability to the minimal measure urged by them in this case  loss of value of the three-month lease. We will not conclude that defendants real estate agent and broker had a lesser duty to respond in consequential damages proximately caused by their negligence because their fee was small or their profit slight in the particular transaction anymore than we would limit a doctor's exposure for surgical malpractice because his fee was small, a lawyer's exposure for misdrawing a will or filing after the statute of limitations ran because his retainer was modest, or an engineer's exposure for a survey error because his charge was minimal.
We hold that the trial judge's finding that the consequential deprivation of income, representing the loss of the benefit of plaintiff's bargain from the four purchase orders, was factually and legally correct in this case, whether measured by contract or tort concepts.
We conclude that the judge should have deducted from the award the amount of labor costs not expended to complete the *322 garments after the cessation of production on August 24 and any costs of delivery to have been incurred by plaintiff. We therefore remand for a recalculation of damages and the entry of a modified judgment in accord therewith.
Appellants' contention that the so-called parol evidence rule was violated by introduction of evidence of trade practice is clearly without merit and is rejected. See N.J.S.A. 12A:1-205(2); N.J.S.A. 12A:2-202(a).
The judgment is so modified and as modified is affirmed. We do not retain jurisdiction.
NOTES
[1] As of September 16 Rubin was still attempting to obtain zoning board approval of a use variance.